[Crim. No. 86.   Department Two.—April 10, 1896.]

# THE PEOPLE, RESPONDENT, *v.* O. L. SMITH, APPEL-LANT.

CRIMINAL LAW—LARCENY—PLEADING—OWNERSHIP—ESTATE OF DECEDENT —VARIANCE—SUFFICIENCY OF COMPLAINT.—There is no substantial variance between a complaint for larceny describing the property stolen as belonging to and being owned by the estate of a deceased person named, and an information describing it as belonging to and being owned by persons named as executor and executrix of the estate of such deceased person; and the description in the complaint cannot be held insufficient under the provisions of section 956 of the code, the offense being described with sufficient certainty to identify the act, and the alleged ownership being in effect in the estate of the deceased person.

ID.—GRAND LARCENY—STEALING OF ANIMAL—CARRYING AWAY OF DEAD STEER—ERRONEOUS INSTRUCTION.—To make the stealing of one of the animals named in section 487 of the Penal Code grand larceny, it must be a live one and not a dead carcass, unless the defendant killed it for the purpose of carrying it away; and if one finds a dead animal, and carries away the body or part of it, he is not guilty of grand larceny unless the part carried away was worth fifty dollars or more; and an instruction to the effect that if a defendant, accused of grand larceny in stealing and carrying away a steer, did not kill it, but, after it was killed by another person, feloniously assisted to take and carry it away with intent to deprive the owner of it, he was guilty, and should be so found, is erroneous.

APPEAL from a judgment of the Superior Court of Mendocino County and from an order denying a new trial.  R. McGARVEY, Judge.

The facts are stated in the opinion.

*J. D. Ruddock,* and *W. G. Poage,* for Appellant.

The complaint should have been set aside, as it charges defendant with stealing property belonging to the estate of W. C. Elledge, which is insufficient.  (*People* v. *Hall,* 19 Cal. 425.)  The complaint alleges the property as belonging to the estate of W. C. Elledge, deceased, while the information alleges ownership in Joseph Elledge and Mrs. M. J. Elledge, as executor and executrix of the estate of W. C. Elledge, deceased.  This is a fatal variance, and the demurrer should have been sustained. (Pen. Code, secs. 950–52; *People* v. *Wallace,* 94 Cal. 497; *People* v. *Parker,* 91 Cal. 91.)  The court erred in in-

structing the jury that if Smith did not kill the steer, but simply helped remove it from the place where Spoerner killed it, he was guilty. (*People* v. *Gassaway*, 28 Cal. 405.)

*W. F. Fitzgerald, Attorney General*, and *Charles H. Jackson, Deputy Attorney General*, for Respondent.

Any rightful possession will constitute a sufficient title in possession to support a charge of larceny against the taker. (12 Am. & Eng. Ency. of Law, sec. 3, p. 765; *Dignowitty* v. *State*, 17 Tex. 521; 67 Am. Dec. 670; *State* v. *Cuningham*, 21 Iowa, 433; Pen. Code, secs. 484, 956; *People* v. *Watson*, 72 Cal. 403; *People* v. *Anderson*, 80 Cal. 205; *People* v. *Ribolsi*, 89 Cal. 496.) The name of the owner of the property stolen is not a material part of the offense charged. It is only required to identify the transaction, so that the defendant, by proper plea, may protect himself against another prosecution for the same offense. (*People* v. *Hughes*, 41 Cal. 235; *People* v. *Potter*, 35 Cal. 110; *Commonwealth* v. *Donovan*, 13 Allen, 571; *Wells* v. *State*, 4 Tex. App. 20; Wharton's Criminal Practice, 9th ed., sec. 119; Wharton's Criminal Evidence, sec. 96; *People* v. *Goggins*, 80 Cal. 229; *People* v. *Rogers*, 81 Cal. 209.)

BELCHER, C.—The defendant was charged by information with the crime of grand larceny, committed in the county of Mendocino, in the month of December, 1894, by stealing a brindle steer, which "was then and there the personal property of another, belonging to and being then owned by Joseph Elledge and Mrs. M. J. Elledge, as executor and executrix of the estate of W. C. Elledge, deceased." He was found guilty as charged, and the judgment was that he be punished by imprisonment in the state prison for the term of four years. From that judgment and an order denying his motion for a new trial he has appealed.

There was no error in denying the defendant's motion to set aside the information, or in overruling the de-

murrer interposed to it. The motion was based upon the theory that the defendant had not been legally held to answer for the offense charged, because in the complaint filed with the committing magistrate, the steer alleged to have been stolen was described as "belonging to and being owned by the estate of W. C. Elledge, deceased," and in support of this theory the case of *People* v. *Hall*, 19 Cal. 425, is cited. But whatever may have been the law in 1861, when that case was decided, such a description cannot be held insufficient now under the provisions of our Penal Code.

Section 956 of that code provides: "When an offense involves the commission of, or an attempt to commit, a private injury, and is described with sufficient certainty in other respects to identify the act, an erroneous allegation as to the person injured, or intended to be injured, is not material."

And in *People* v. *Leong Quong*, 60 Cal. 107, it is said: "The name of the owner of property stolen is not a material part of the offense charged. It is only required to identify the transaction, so that the defendant, by proper plea, may protect himself against another prosecution for the same offense."

The case of *People* v. *Wallace*, 94 Cal. 497, cited by appellant, is not in point. In that case the defendant was charged in the complaint filed before the magistrate with the larceny of "three certain steers, the property of Joseph Wright and E. J. Jones," while in the information he was charged with stealing "the personal property of one Joseph Wright, to wit, two certain steers." It was held that this variance was fatal, the court saying: "It is manifest that there is such a variance between the offense described in the complaint and that charged in the information, that the one cannot be deemed the same as the other."

In this case there was no substantial variance in the offense, as charged in the complaint and in the information. In each the offense was described with sufficient certainty to identify the act, and the alleged ownership

was in effect the same, namely, in the estate of W. C. El-
ledge, deceased.

The demurrer was based upon the same grounds as
the motion, and what has already been said sufficiently
disposes of the objections to the ruling upon it.

At the trial one Andrew Spoerner was called as a wit-
ness for the prosecution, and his testimony was practi-
cally all that was given on that side of the case.

He testified in substance as follows: Defendant was
living with his family at Low Gap, in Mendocino county.
He was occupying a piece of land for the purpose of
securing it as a homestead. In December, 1894, witness
went to defendant's place, and was asked by him to stay
there a couple of months, and help put up a house, and
make some improvements. During the month of De-
cember defendant told witness that he had some stock—
good sized heifers—running around, and he wanted wit-
ness to help him butcher one. On the third Sunday in
the month they went out together, defendant packing a
rifle, and witness an ax. After walking some time over
the hills in company, defendant heard a bell, and said:
"That's where the stock are running." He then went
off, and the witness walked around to keep warm. After
awhile witness saw the cattle up the hill crossing the
ridge, with defendant after them. A little later wit-
ness heard a shot, and then followed in the direction
where he heard it, and found defendant with the steer
shot and his throat cut. Witness helped defendant to
skin the steer, and cut the meat out, and pack it home
on a horse. They only packed a piece home that day.
The next day it rained, so they waited till Tuesday,
when they got a horse, and went again. Witness then
cut the meat out, put it in a sack, and defendant packed
it up the hill with the horse. They left the hide, as it
was badly cut up. Defendant salted the meat down,
and when witness left his place he had just begun smok-
ing it. Witness guessed it was more than four miles over
a rough country to the place where the steer was killed.
In June following, witness took two other parties to the

place where the steer was killed, and showed them the bones.   He further testified that he remained at defendant's place about four weeks after the steer was killed, and then left, and that he was friendly with him before, but not then.   It was further proved that the animal killed belonged to the estate of W. C. Elledge, deceased.

For the defense, the defendant's wife, her son by a former marriage, then a little more than ten years old, and the defendant, were called and examined as witnesses.   Each witness testified that on the Sunday when the steer was shot the defendant was at home all day, and did not go out with Spoerner at all.

Mrs. Smith testified in substance that on Saturday night Spoerner asked her husband to go hunting with him, and her husband told him he would not go; that the next morning at breakfast Spoerner again asked her husband to go hunting with him, and the latter told him, "No"; that shortly after Spoerner went away with an ax and gun on his shoulder, and that when he came back it was nearly dark, after she and her husband had had supper; that he had a piece of meat which he threw down, and said, "Fry it for supper"; that she asked what it was, and he said: "Well, a big buck I shot"; that after that he told her husband, "You get Hill's horse, and go with me, and help me get that meat home.   I have lots in the woods"; that it rained Monday and Tuesday, and on Wednesday he said the meat must be got in; that her husband then went and got Hill's horse, and they then went away, the boy going with them; that in the evening, about six o'clock, they came back, bringing three or four sacks of meat on the horse; that they took the meat out and let it lie over night; that when she saw the meat she said: " Did you kill a beef?" and Spoerner said, "Yes"; that she told Spoerner: "You bring us all into trouble; whose beef is that?" He said, "What the hell do you want to know about it?  Any trouble that I bring on I defend it, and you mind your own business"; that when Spoerner left he took a sackfull of the meat, and "the rest he said we

could keep for his board." "He gave the meat to me. My husband said we did n't want it at all, and the next time he come he should take some along. He said when he got his clothes he would take some of it along."

Defendant testified: "On the Sunday this beef is alleged to have been killed I was at home. Mr. Spoerner was stopping with me at the time. He came there right after Thanksgiving. There was a sort of agreement between us that he was to help me and I would return it next fall. I told him before we went into this agreement that grub was scarce—times were hard—it would be hard to get provisions.

"On the Saturday night previous to the alleged killing of this beef he proposed to me to go out and get some pork. I told him I didn't want any pork. On Sunday morning after breakfast he went out, taking my rifle with him. He was gone all day. I did not go with him. I was at home all day with my wife and boy. He came home about 6 o'clock on that Sunday evening, bringing a piece of meat—about thirty-five pounds—with him. He remarked to the boy that he had killed a big buck out in the woods. That evening he said he had a big beef in the woods and wanted me to get a horse and help him pack it in. I got Hill's horse and we took the boy with us, went out and got the meat, brought it in and salted it down. I smoked it afterward. Spoerner left it at my house; he was to take it home when he came after his clothes. He took some when he left my house."

The court gave to the jury certain instructions asked by defendant, and then, of its own motion, charged them as follows:

"Now, gentlemen, I charge you that if this defendant, and that man Spoerner, went out to the range, or any other place in the woods, and that the defendant killed the steer and helped carry it to his home, and he did it feloniously, then he is guilty.

"I charge you furthermore, and bear this in mind, if he did not kill it—if Spoerner killed it—and he did not

believe really that it was Spoerner's property, and he
feloniously helped to remove it from the place where it
was killed by Spoerner, and he took it to his place, or
carried it to any other place, for the purpose of depriv-
ing the owner of the property, he is guilty, notwith-
standing he did not kill it himself.

" The killing of the steer or a hog on a man's prem-
ises is not larceny.

"That is not what he is charged with.    He is charged
with the asportation of the property, that is, taking it
and carrying it away.    While it lay on the premises
there, shot down, it was yet the property of the estate
of Elledge, and the man who feloniously took it from
that place and carried it away, knowing it was not his
own, with the intention of depriving the owner of it, is
guilty of larceny."

By our statute larceny is defined to be " the felonious
stealing, taking, carrying, or driving away the personal
property of another."    (Pen. Code, sec. 484.)

The offense is divided into two degrees, grand larceny
and petit larceny.    It is grand larceny: 1. When the
property taken is of a value exceeding fifty dollars; 2.
When the property is taken from the person of another;
3. When the property taken is a horse, mare, gelding,
cow, steer, etc.    In all other cases it is petit larceny.
(Pen. Code, secs. 486–88.)    To make the stealing of one of
the animals named, however, grand larceny, the animal
must be a live one and not a dead carcass.    It is true, if
one should kill one of the animals for the purpose of
stealing it, and then take and carry away the whole or
a part of the body, it would be grand larceny.    But if
one should go into a field and find a dead animal lying
there, and should take and carry away the body or a
part of it, it would not be grand larceny, unless the part
carried away was of the value of fifty dollars or more.

In *Hunt* v. *State*, 55 Ala. 138, the law upon this sub-
ject is very clearly and correctly stated.    In that case
the defendant was indicted for stealing a hog, and by
the law of the state the stealing of a hog was declared

to be grand larceny. The trial court instructed the jury
"that, if they should believe from the evidence that the
defendant killed the hog accidentally, and put it in the
swamp for concealment, and not with the felonious in-
tent to convert it to his own use, or with intent to de-
prive the owner of his property therein; still, if they
should believe from the evidence, beyond a reasonable
doubt, that he afterward went to the place where he
had carried the hog, and then feloniously took and
carried away the same, or any part thereof, he would be
guilty as charged in the indictment."

On appeal this instruction was held to be erroneous,
the court saying: "If the animal was not killed with
the intent, then entertained, of stealing it, or some part
of its carcass, but the act was in truth done without any
such purpose, though recklessly, the subsequent cutting
and taking away by the defendant of a part of the body,
in the course of the night following, or the next day,
would not make him guilty of grand larceny, the whole
hog being of the value of only six dollars. It is the
*live* hog that he must intend to steal (which he may, of
course, do by killing it and then taking it away) that
constitutes grand larceny in such a case. But, if after
it is killed, no matter by whom, if not done by the de-
fendant, or some one with whom he is conspiring with
intent to steal the body, or some part of it, a purpose is
afterward formed and carried into effect of taking and
carrying away a part of the meat, the person guilty of
this is not guilty of grand larceny, or of stealing a
'hog,' within the meaning of the statute. The act of
trespass and the felonious intent do not so coexist as to
make the offender guilty of that crime." (Citing Bishop
on Criminal Law, 3d ed., sec. 366 (314), and cases cited
in note.)

The instructions in this case were in clear conflict
with the rule above declared. They, in effect, told the
jury that if Spoerner killed the steer and defendant did
not believe it was his property, but feloniously assisted
to asport the meat to his own house, he was guilty and

should be so found. This certainly cannot be sound law.

The point is made that, according to his own testimony, Spoerner was an accomplice, and that his testimony, being uncorroborated, was not sufficient to warrant a conviction; but that question need not be considered.

The judgment and order appealed from should be reversed, and the cause remanded for a new trial.

HAYNES, C., and BRITT, C., concurred.

For the reasons given in the foregoing opinion the judgment and order appealed from are reversed and the cause remanded for a new trial.

McFARLAND, J., TEMPLE, J., HENSHAW, J.